IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| AT&T TELEHOLDINGS, INC. and AT&T WIRELINE HOLDINGS, LLC, | § | |
| Plaintiffs, | § | Civil Action No. 3:26-cv-2919 |
| v. | § | |
| CHARTER COMMUNICATIONS, INC. and SPECTRUM MANAGEMENT HOLDING COMPANY, LLC, | § | **Jury Trial Demanded** |
| Defendants. | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

AT&T Teleholdings, Inc. and AT&T Wireline Holdings, LLC (collectively, "AT&T") bring this action under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and Texas unfair-competition law against Charter Communications, Inc. and Spectrum Management Holding Company, LLC (collectively, "Charter") due to Charter's deceptive advertising, which falsely suggests that its "Fiber-Powered Internet" reaches customers' homes entirely over fiber optic cable.

## INTRODUCTION

1. This case challenges Charter's false advertising campaign for its residential internet service, marketed under the Spectrum brand to consumers nationwide. At the center of that campaign is Charter's claim that Spectrum Internet is "Fiber-Powered" and delivered over the "Spectrum Fiber Broadband Network."

2. That claim conveys to reasonable consumers the misleading impression that Spectrum Internet is a fiber-to-the-home service comparable to AT&T Fiber. In fact, the vast majority of Spectrum Internet runs over a hybrid fiber-coaxial ("HFC") network, where the critical "last mile" connection to the customer's home uses *copper coaxial cable*, not fiber.

3. Charter deceives consumers by manipulating the word "fiber" in its advertising so it can tout its "Spectrum Fiber Broadband Network" and hide the fact that its network mainly connects to customers' homes using copper wire.

4. Charter's own FAQ on its Spectrum Fiber Broadband Network page highlights the difference: "100% Fiber Internet uses a dedicated fiber infrastructure all the way from the network hub to the premises" while "Fiber-Powered Internet uses an advanced HFC infrastructure, which includes fiber for the majority of the network path and coaxial to connect to the premises." Charter's fine print admits what its advertising conceals.

5. Charter's 100% fiber service is available only to "select residential consumers," according to Charter's website. It represents a small percentage of Charter's network.

6. By placing both services under the "Spectrum Fiber Broadband Network" umbrella and referring to the predominating hybrid fiber-copper service as "Fiber Powered," Charter blurs the distinction between 100% fiber and the inferior hybrid copper-based service, deliberately appropriating the "fiber halo" in the internet services space to the detriment of consumers and competitors.

7. Charter knows the difference between 100% fiber and a fiber-copper hybrid matters to customers. On its website, Charter touts the "Peak Performance" of its genuine 100% fiber service by highlighting reliability, symmetrical upload speeds, and low latency—the qualities consumers expect from fiber internet. The "Fiber-Powered Internet" campaign seeks to coast off those expectations.

8. Recently, Charter acquired Cox Communications, which also uses the misleading phrase "Fiber-Powered Internet" to advertise its hybrid fiber-copper network. That acquisition positions Charter to amplify the extent of its deceptive campaign.

9. Charter's "Fiber-Powered Internet" claims are literally false or false by necessary implication. They are, in any event, impliedly false and misleading because they leave a substantial segment of reasonable consumers with the misleading impression that "Fiber-Powered Internet" delivers internet connectivity to consumers' homes through fiber alone, leaving out the copper-wire connection from the node to the home. The campaign deceives consumers, distorts competition, and appropriates the goodwill that AT&T's 100% fiber network has earned. AT&T seeks an injunction and damages.

## PARTIES

10. Plaintiff AT&T Teleholdings, Inc. is a Delaware corporation with its principal place of business in Dallas, Texas.

11. Plaintiff AT&T Wireline Holdings, LLC is a Delaware limited liability company with its principal place of business in Dallas, Texas.

12. AT&T and its affiliates provide internet and telecommunications services to consumers throughout the United States, including in this District.

13. Defendant Charter Communications, Inc. is a Delaware corporation with its principal place of business in Stamford, Connecticut.

14. Defendant Spectrum Management Holding Company, LLC is a Delaware limited liability company with its principal place of business in St. Louis, Missouri.

15. Charter markets and provides its residential internet service under the brand name "Spectrum." Charter's Spectrum internet service is one of the largest broadband services in the United States, and Charter provides internet, cable, and telecommunications services nationwide.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 1121 because AT&T asserts a federal claim for false advertising under the Lanham Act, 15 U.S.C. § 1125(a). This Court has supplemental jurisdiction over AT&T's related state-law claim under 28 U.S.C. § 1367 because that claim arises out of the same common nucleus of operative facts and forms part of the same case or controversy as AT&T's federal claim.

17. This Court has personal jurisdiction over Charter under the Texas long-arm statute, Tex. Civ. Prac. & Rem. Code § 17.042, and the Due Process Clause. Because the Texas long-arm statute is coextensive with due process, the statutory and constitutional inquiries merge.

18. Charter has purposefully availed itself of the privilege of conducting activities in Texas and purposefully directed its activities at this forum, such that it should reasonably anticipate being haled into court here. Charter sells and provides Spectrum-branded

residential internet service to hundreds of thousands of Texas consumers; maintains and services physical network infrastructure in Texas, including in this District; bills and collects revenue from Texas customers; operates and directs Texas consumers to its website, through which Texas consumers view the challenged "Fiber-Powered Internet" and "Spectrum Fiber Broadband Network" claims and purchase service; purchased and ran the specific television advertisements identified in this Complaint on broadcast, cable, and streaming outlets serving the Dallas-Fort Worth area; sent promotional emails to Texas residents; and, through its August 20, 2026 acquisition of Cox Communications, expanded its "Fiber-Powered" messaging to Texas consumers.

19. Charter committed tortious acts in whole or in part in Texas by disseminating the false and misleading advertising at issue to Texas consumers. Charter knew that this conduct would cause injury to AT&T, whose principal place of business is in Dallas, Texas.

20. This Court's exercise of jurisdiction over Charter is fair and reasonable and comports with traditional notions of fair play and substantial justice. Charter is a nationwide provider that litigates routinely and faces no meaningful burden in defending this action in a state where it operates a network and sells services. Texas has a strong interest in protecting its consumers and its resident businesses from deceptive advertising; AT&T has a substantial interest in obtaining relief in its home forum; and this District is an efficient forum because the relevant evidence, consumers, and injury are located here.

21. Alternatively, and in any event, Charter is otherwise subject to jurisdiction in Texas by registering to do business and maintaining a registered agent in Texas.

22. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to AT&T's claims occurred in this District, including Charter's dissemination of the challenged advertising to consumers and the resulting injury to AT&T's business, goodwill, and customer relationships.

23. Charter's false claims are intended to reach and, on information and belief, have reached consumers in this District. Charter also provides internet services here and has profited, or likely will profit, from the challenged advertising.

## FACTUAL ALLEGATIONS

### A. AT&T and Charter compete head-to-head for the same residential internet customers, and AT&T Fiber is the 100% fiber service Charter's advertising imitates.

24. AT&T is one of the nation's leading internet service providers and offers high-speed fiber internet ("AT&T Fiber") to residential and business consumers across the United States, including in Dallas, Texas.

25. AT&T Fiber has received numerous third-party accolades for the speed and overall quality of its internet service. For example, Ookla's Speedtest Connectivity Report recently determined that "AT&T Fiber offered the Best Internet, and was the Fastest Fixed Network in the United States." *See* https://www.ookla.com/research/reports/united-states-speedtest-connectivity-report-h1-2026.

26. Charter is one of the nation's largest internet service providers. Under the Spectrum and Cox brands, it competes with AT&T for internet customers, including in the same areas where AT&T offers fiber internet service.

27. Charter's advertising directly targets consumers who might otherwise choose AT&T as their provider.

28. Consumers choosing a business or residential internet provider consider the underlying delivery technology material. Perceived speed, reliability, and latency of the services substantially affect consumer choice in internet service providers.

**B. Charter's "Spectrum Fiber Broadband Network" intentionally blurs the line between two distinct services.**

29. Charter's umbrella label covers two distinct internet services. Most of the "Spectrum Fiber Broadband Network" is a hybrid fiber-copper internet service that Charter calls "Fiber-Powered Internet." Charter's 100% fiber service is available only to select residential customers. Charter knows the difference but seeks to leverage fiber's "halo effect" by claiming its hybrid service is "powered" by fiber while hiding the fact that the critical "last mile" into customers' homes travels over copper wire.

30. As of August 28, 2026, Charter's website at https://www.spectrum.com/cp/fiber-broadband-network features a page titled "The Spectrum Fiber Broadband Network." Under the heading "The Network of Networks," Charter advertises "a Fiber broadband network, nationwide 5G and Advanced WiFi to keep you connected." The page places "100% Fiber" and "Fiber-Powered" claims alongside nationwide 5G and Advanced WiFi claims.




The graphic fails to disclose that Charter's 100% fiber service is available only to a select number of residential consumers.

31. On August 21, 2026, in connection with its acquisition of Cox Communications, Charter sent former Cox customers a promotional email welcoming them to Spectrum and describing its network as the "Spectrum Fiber Broadband Network." The email calls Charter "America's Connectivity Company®," says its services are "delivered over our Spectrum Fiber Broadband Network" to "more than 70 million customers in 45 states," and claims that "[a]s a Spectrum customer, you'll benefit from the most expansive and dependable network in the country." It also touts "100% Fiber Internet to more than one million underserved homes and businesses each year." The message reinforces the misleading impression that Charter provides 100% fiber internet to all customers.

### C. Charter's "Fiber-Powered Internet" claim is false and misleading.

32. Charter's "Fiber-Powered Internet" claim deceives consumers in at least three ways. First, the phrase intentionally leverages the "halo effect" of 100% fiber services like AT&T's. Second, it creates the false impression that a consumer's internet service is connected to the premises by fiber alone. Third, the advertisements fail to adequately disclose the distinction between hybrid fiber-copper internet and 100% fiber.

33. Charter delivers its "Fiber-Powered Internet" over a hybrid fiber-copper network in which fiber runs to a neighborhood "node," but copper coaxial cable—not fiber—runs from the node to the customer's home. This "last mile" architecture is technologically and functionally distinct from true fiber-to-the-home networks.

34. Charter chose "Fiber-Powered Internet" deliberately. Internet service is not "powered" by fiber in the first place. Fiber is merely a conduit—and in Charter's case, it is only one of two conduits with markedly different characteristics. But the phrase allows Charter to convey to consumers that its service uses fiber alone without reference to its copper-wire connectivity to the home.

35. True fiber-to-the-home networks, like AT&T Fiber, deliver fiber optic cables directly to the customer's premises through a dedicated, passive connection capable of lower latency, higher consistency, and superior performance during peak congestion. Charter's hybrid fiber-copper network instead uses shared copper coaxial cable for the "last mile," which introduces active elements—such as amplifiers, nodes, and splitters—that can reduce reliability. Signal-to-noise ratio, spectrum availability, distance from the node, and the presence of legacy services affect hybrid fiber-copper performance, making it more complex and less consistent than fiber-to-the-home. These material differences affect

consumers' actual service experience, including reliability, upload speeds, and latency during peak usage. Charter's advertising deliberately obscures them.

36. Charter knows the distinction matters to customers. Further down its "Spectrum Fiber Broadband Network" page, it illustrates the difference:




37. At the bottom of the page, Charter poses the question "What is the difference between Fiber-Powered Internet and 100% Fiber?" in a drop-down FAQ. It answers that "100% Fiber Internet uses a dedicated fiber infrastructure all the way from the network hub to the premises" while "Fiber-Powered Internet uses an advanced HFC infrastructure, which includes fiber for the majority of the network path and coaxial to connect to the premises."

38. On a separate page, Charter tacitly acknowledges the performance gap. It touts the "Peak performance" of its 100% fiber service and identifies reliability, symmetrical upload speed, and low latency as the three defining characteristics of all-fiber internet services. *See* https://www.spectrum.com/internet/fiber-internet.




**D. Charter's television ads repeatedly tout "Fiber-Powered Internet" without adequately disclosing the hybrid copper connection to customers' homes.**

39. For months, Charter has released a torrent of advertising extolling its "Fiber-Powered Internet." For example:

40. "It's Only Everything: Move (Spectrum Fiber)" first aired on September 16, 2025. The thirty-second spot promotes "Spectrum Fiber-Powered Internet. The most reliable internet you can count on," and adds, "It's only everything."

41. "Gig Internet and the Spectrum Savings Guarantee II" first aired on October 10, 2025. The thirty-second spot advertises "fiber-powered gig internet with equal upload and download speeds" for $50 per month.

42. "Free Internet Forever (Free Internet Advantage When Add 4 Mobile Lines)" first aired on October 13, 2025. The spot repeatedly promotes "free fiber-powered internet forever" for consumers who get four mobile lines.

43. "Seamless Connection Everywhere You Go (Spectrum One, 5G + Fiber Internet)" first aired on November 19, 2025. It markets Spectrum One as "5G and fiber-powered internet, seamlessly combined for the fastest wireless speeds."

44. "Spectrum Savings Guarantee III" first aired on February 24, 2026. Like its predecessor, it advertises "Spectrum fiber-powered gig internet with equal upload and download speeds for $50 a month."

45. "Spectrum Savings Guarantee (Free Internet Advantage Forever When Switching 4 Mobile Lines)" also launched on February 24, 2026. The spot promises "free fiber-powered internet forever" to consumers who switch four mobile lines, plus $1,000 in guaranteed first-year savings.

46. "Pres Studio Architecture (B2B, Free Business Internet Advantage When Add 4 Mobile Lines)" first aired on March 3, 2026. It features a small-business testimonial and closes with "get your business free fiber-powered internet forever."

47. "Family BBQ, Spectrum Savings Guarantee" first aired on March 31, 2026. It offers "Spectrum Fiber-Powered Internet free forever" with the addition of four mobile lines and the "Spectrum Savings Guarantee."

48. "You Shouldn't Have to Choose between Speed, Reliability and Value, QR Code (Fiber-Internet $40/mo)" first aired on May 18, 2026. The ad claims that "Spectrum Fiber-Powered Internet" delivers speed, reliability, and value "for just $40 a month" and is "the fastest and most reliable internet."

49. "Speed, Reliability and Value, QR Code (Free Internet Advantage Forever When Switching and Adding 4 Mobile Lines)" first aired on May 18, 2026. It pairs the same speed, reliability, and value claim for "Spectrum Fiber-Powered Internet" with an offer of "free internet forever with the addition of four mobile lines."

50. "You Shouldn't Have to Choose between Speed, Reliability and Value (Fiber-Internet $40/mo)" first aired on May 26, 2026. The fifteen-second spot repeats that "Spectrum Fiber-Powered Internet" delivers speed, reliability, and value for $40 per month.

51. "You Shouldn't Have to Choose between Speed, Reliability and Value III, QR Code, Internet Assist (Internet Assist $15/mo)" first aired on June 10, 2026. It claims that "Spectrum Fiber-Powered Internet" delivers speed, reliability, and a dependable price at $15 per month for qualifying households.

52. "Spectrum Life Line. Shouldn't Have to Choose between Speed, Reliability and Value (Internet $10/mo w/$20 monthly credit)" first aired on July 7, 2026. It promotes "Fiber-Powered Internet" for $10 per month.

53. "Spectrum Fiber Internet Powers It All for Students" first aired on July 20, 2026. It targets students and promotes "Fiber-Powered Internet from only $40/mo."

54. "Connect to What's Next with Spectrum Fiber-Powered Internet (Fiber-Internet $40/mo.)" first aired on August 1, 2026. It promotes "Spectrum Fiber-Powered Internet" at $40 per month with "the speed and reliability you need" and no contract or commitment.

55. Each advertisement uses the phrase "Fiber-Powered Internet" and none clearly and conspicuously discloses the difference between 100% fiber and hybrid fiber-copper internet.

56. The disclosure in the "You Shouldn't Have to Choose between Speed, Reliability and Value III, QR Code, Internet Assist (Internet Assist $15/mo)" ad is typical. When "Spectrum Fiber-Powered Internet" first appears onscreen, it is accompanied by a

miniature, momentary disclosure at the bottom of the screen amid loud music and rapidly moving visual stimuli. The disclosure says, "Spectrum Internet® is powered by fiber and connected to the premises by coaxial lines," but the voiceover does not read it aloud. That disclosure is inadequate to cure the deception caused by Charter's "Fiber-Powered Internet" claim.




57. When "Fiber-Powered Internet" appears onscreen a second time, the disclosure is absent from the additional disclaimers at the bottom of the screen.




**E. Charter's Spectrum brand acquires Cox Communications, amplifying the reach of the deceptive advertising.**

58. On August 20, 2026, Charter Communications acquired Cox Communications, bringing Cox's internet services under Charter's Spectrum brand.

59. Like Charter, Cox has historically advertised "Fiber-Powered Internet" that is, in fact, hybrid fiber-copper internet. That message has persisted post-acquisition. The acquisition positions Charter to magnify the extent of its deceptive "Fiber-Powered Internet" campaign.

60. For example, Cox's residential internet webpage advertises "fast, fiber-powered speeds." *See* https://www.cox.com/residential/internet.html.




61. Buried within that representation is a disclosure statement visible only when a consumer clicks on the small, circular info icon that follows the word "powered." The disclosure is almost identical to Spectrum's and says that "Cox internet is powered by fiber and connected to the premises via coaxial cable."




62. Cox, like Spectrum, understands the material benefits of 100% fiber. One of the FAQs on the portion of its website advertising 100% fiber asks, "What are the benefits of fiber internet?" Cox explains that "Fiber is the future" because "it provides fast, reliable speeds, and can scale to keep up with the increasing bandwidth demands of your cloud and connected devices." It adds that "Fiber-optic cables . . . enabl[e] the fastest symmetrical

upload/download speeds, meaning your upload speeds are equal to your download speeds," while "[t]raditional cable transmits data over metal cables and cannot currently support symmetrical upload/download speeds." Cox also praises fiber networks as "less likely to be impacted by a power outage than traditional internet transport networks" and "less susceptible to signal interference," which results in "less downtime." *See* https://www.cox.com/residential/internet/fiber.html.

63. Having joined forces with another company using the same false and misleading "Fiber-Powered Internet" claim, Charter is now positioned to amplify its consumer deception and competitive harm.

**F. Charter's false advertising causes AT&T irreparable harm.**

64. Charter's false and misleading advertising injures AT&T and consumers by distorting the market, diverting consumers from AT&T to Charter, and inducing purchases based on false premises. In the highly competitive residential internet market, consumers who switch providers based on Charter's false and misleading "Fiber-Powered Internet" claim cause AT&T to lose revenue, customer lifetime value, and opportunities to cross-sell related services.

65. Speed, reliability, latency, and overall service quality are among the most important factors consumers weigh when choosing an internet service provider. Charter's own marketing materials show that these considerations drive consumer choice.

66. Accordingly, AT&T has invested substantial time and resources in developing and implementing a 100% fiber network for internet users across the country. AT&T Fiber provides the capacity, symmetrical upload and download speeds, low latency, and scalability that modern internet use increasingly demands, especially as consumers and

businesses embrace bandwidth-intensive services like AI. Charter's deployment of a 100% fiber network has lagged behind, so it has resorted to misleading consumers with phrases like "Fiber-Powered Internet" until it catches up.

67. Charter designed its claims to induce AT&T subscribers and other consumers to switch to or sign up with Charter by falsely suggesting that "Fiber-Powered Internet" is a 100% fiber service like AT&T's.

68. When a consumer switches providers, AT&T suffers immediate and often irreparable harm, including lost sales, lost customer relationships, and lost opportunities to cross-sell services.

69. Customer acquisition and retention of existing internet subscribers are critical to AT&T's business, hence AT&T's substantial investment in a cutting-edge 100% fiber network. Charter's deceptive advertising compromises both.

70. Charter's conduct has damaged and will continue to damage AT&T's goodwill, reputation, and competitive position. AT&T has no adequate remedy at law. Absent injunctive relief, it will continue to suffer irreparable injury.

## CLAIMS

## COUNT I

**(False Advertising in Violation of the Lanham Act, 15 U.S.C. § 1125(a))**

71. AT&T incorporates each preceding allegation by reference.

72. In connection with goods and services in interstate commerce, Charter has knowingly made false or misleading descriptions and representations of fact about the nature, characteristics, and qualities of Charter's goods, services, and commercial activities,

in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Charter's advertising is disseminated in interstate commerce.

73. Calling Spectrum and Cox HFC Internet "Fiber-Powered Internet" is literally false. So too is describing their hybrid fiber-copper networks as a "Fiber Broadband Network." In context, Charter's advertising conveys the unambiguous message that Spectrum Internet is a fiber-only internet service or equivalent to 100% fiber offerings.

74. That message is false: Charter's internet service is largely delivered over a hybrid fiber-copper network in which the "last mile" connection to the customer's home uses copper coaxial cable, not fiber. That architecture is fundamentally different from true fiber-to-the-home services like AT&T Fiber, which deliver fiber optic cables directly to the customer's premises. "Fiber-Powered Internet" falsely conveys that Charter provides a 100% fiber service with the same performance.

75. In the alternative, if the claim is not literally false, it is impliedly false and misleading because it deceives or has the capacity to deceive a substantial segment of reasonable consumers into believing that Spectrum Internet is delivered to the home over fiber alone.

76. Charter made those false or misleading descriptions or representations of fact in commercial advertising in a manner material to the public's decision to purchase such products.

77. AT&T and Charter directly compete in the relevant internet-service space, and Charter's false advertising deceives a substantial number of consumers.

78. Charter's false and misleading statements about its goods, services, and commercial activities have damaged AT&T's goodwill and reputation and harmed its competitive position.

79. AT&T has suffered irreparable harm to its goodwill, reputation, and competitive position and lacks an adequate remedy at law. It will continue to suffer irreparable injury unless this Court enjoins Charter's false claims under 15 U.S.C. § 1116.

80. Charter has profited and will continue to profit from sales driven by consumers' reliance on false claims about the nature, qualities, and characteristics of its internet service.

81. Under 15 U.S.C. § 1117, AT&T is entitled to recover actual damages in an amount to be determined at trial, enhanced damages, a finding that this is an exceptional case, and all costs and attorneys' fees incurred by AT&T in this action.

**COUNT II**

**(Common Law Unfair Competition under Texas Law)**

82. AT&T incorporates each preceding allegation by reference.

83. Charter made the false and misleading explicit and implicit representations of fact described above in its advertising, and those representations constitute unfair competition under Texas common law.

84. Charter knows, or should know through reasonable diligence, that its advertising is false and likely to deceive consumers about the nature, characteristics, and qualities of the "Fiber-Powered Internet" offered by Spectrum and Cox compared with AT&T Fiber.

85. That conduct has caused—and, unless enjoined, will continue to cause—consumer deception and injury to AT&T's business, reputation, and goodwill. AT&T is entitled to relief under Texas common-law unfair-competition principles.

## PRAYER FOR RELIEF

AT&T respectfully requests that the Court enter judgment against Charter and grant the following relief:

1. A judgment declaring that Charter has violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and engaged in unfair competition under Texas common law;

2. Injunctive relief, pursuant to 15 U.S.C. § 1116, enjoining Charter and its officers, agents, servants, employees, and all those acting in concert with it from disseminating false and misleading advertising claims as set forth herein in any form or medium, and requiring Charter to cease describing its hybrid fiber-copper service as "Fiber-Powered";

3. An Order directing Charter to account to AT&T for all gains, profits, and advantages obtained by Charter because of the false advertising campaign and unfair competition and awarding AT&T disgorgement of Charter's profits in the amount of such unlawful gains;

4. An Order awarding to AT&T all actual damages resulting from Charter's unlawful conduct in an amount to be determined at trial and increased and enhanced in this Court's discretion pursuant to 15 U.S.C. § 1117;

5. An Order awarding to AT&T enhanced damages as permitted under 15 U.S.C. § 1117 and finding that this is an exceptional case due to the intentional nature of Charter's false advertising;

6. An Order awarding pre-judgment and post-judgment interest at the maximum rate allowed by law;

7. An Order requiring Charter to pay AT&T's costs, attorneys' fees, and expenses; and

8. Such other and further relief as this Court deems just and proper.

## JURY DEMAND

AT&T hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury on all issues so triable.

Dated: August 28, 2026

Respectfully submitted,

**REESE MARKETOS LLP**

*/s/ Pete Marketos*
Pete Marketos
State Bar No. 24013101
pete.marketos@rm-firm.com
Tyler J. Bexley
State Bar No. 24073923
tyler.bexley@rm-firm.com
Andrew O. Wirmani
State Bar No. 24052287
andrew.wirmani@rm-firm.com
William J. Hamilton
State Bar No. 24110808
will.hamilton@rm-firm.com

750 N. Saint Paul St., Suite 600
Dallas, Texas 75201
Telephone: (214) 382-9810

**ATTORNEYS FOR PLAINTIFFS AT&T TELEHOLDINGS, INC. AND AT&T WIRELINE HOLDINGS, LLC**